UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

MIKO ENTERPRISES, INC.,
MARVIN L. PIERSMA, Trustee
for the Marvin L. Piersma Trust
dated February 28, 1989, and
ALLEGAN REAL ESTATE, LLC,

    Plaintiffs,

v.                                                                                  Case No. 1:09-CV-988

ALLEGAN NURSING HOME, LLC,                          HON. GORDON J. QUIST

    Defendant,

v.

CAPITAL FUNDING GROUP, INC.,
1200 ELY STREET HOLDINGS CO., LLC,
and UNITED STATES OF AMERICA,

    Intervening Parties.
_____/

## **OPINION**

This case is about whether Plaintiff Marvin L. Piersma, Trustee for the Marvin L. Piersma Trust dated February 28, 1989 (referred to herein alternatively as "Piersma" or "Trust"), a judgment creditor, has a valid first security interest in the accounts receivable of a nursing home and whether he can obtain a writ of execution to collect the nursing home's accounts receivable. Because the case is document intensive and the Court has read the documents and briefs, the Court does not believe that oral argument is necessary or would be helpful. For the following reasons, the Court finds that Piersma can forthwith enforce his security interest to collect the indebtedness.

## I. Facts and Procedural History

### A. Operation of the Nursing Home

Plaintiff, Allegan Real Estate, LLC, and Defendant, Allegan Nursing Home, LLC, are separate legal entities. No party has asserted otherwise. Prior to September 2008, Allegan Real Estate and Allegan Nursing Home were both owned by Piersma.[1] Allegan Real Estate is the former owner of real and personal property located at 1200 Ely Street, Allegan, Michigan (the "Property"). The Property consists of a 123-bed residential care facility or nursing home, together with various personal property used to operate the nursing home. In 1993, Allegan Nursing Home acquired from the then-operator of the nursing home certain assets required to run the facility, including a license from the State of Michigan; Certificates of Need; and (3) Provider Agreements under Medicaid and Medicare. Thus, while Allegan Real Estate owned the real and personal property used in the operation of the nursing home, Allegan Nursing Home actually operated the nursing home facility.

### B. The 2000 Refinancing

In March 2000, Allegan Real Estate sought to refinance its existing mortgage loan on the Property. Capital Funding Group, Inc. agreed to refinance the loan, and the loan was to be insured by the United States Department of Housing and Urban Development ("HUD") under its Section 232 program.[2] *See* 12 U.S.C. § 1715w. The following documents were executed on March 30, 2000, in connection with the refinancing transaction:

    (1)    Mortgage Note from Allegan Real Estate to Capital Funding Group in the amount of $2,923,100 (Pl.'s Br. Supp. Mot. Enforce Ex. 1.);

---

[1] Piersma's son, Mark A. Piersma, was also involved in the limited liability companies but the precise nature of his involvement or ownership interest is irrelevant to whether Piersma may enforce his security interest.

[2] All references to HUD include HUD and its component agency, the Federal Housing Administration.

(2) a Mortgage on the Property from Allegan Real Estate, as mortgagor, in favor of Capital Funding Group, as mortgagee (Pl.'s Br. Supp. Mot. Enforce Ex. 2.); and

(3) a Security Agreement between Allegan Real Estate and Capital Funding Group covering the personal property, including the accounts receivable, of **Allegan Real Estate** (Pl.'s Br. Supp. Mot. Enforce Ex. 3.).

The Security Agreement on the personal property provided that the "*collateral does not include anything which is not owned by Debtor (Allegan Real Estate).*" (Pl.'s Br. Supp. Mot. Enforce Ex. 3 at 2.) **Allegan Nursing Home** was not a party to these documents and nothing gave Capital Funding Group a security interest in the receivables of Allegan Nursing Home.

At the same time the refinancing documents were signed, Allegan Real Estate and Allegan Nursing Home entered into a Lease authorizing Allegan Nursing Home to "occupy and use the Project for the operation of a nursing home and for no other purpose." (Pl.'s Br. Supp. Mot. Enforce Ex. 4 at 1.) HUD regulations allow a nursing home facility owner to lease the facility to a qualified operator, subject to HUD's prior written approval. HUD Handbook 4600.1 § 2.2( F). Pursuant to the Lease, Allegan Nursing Home agreed to make monthly rent payments in an amount sufficient to cover the mortgage. In addition, the Lease granted a first priority security interest to Allegan Real Estate in Allegan Nursing Home's license, Provider Agreements, and Certificates of Need (the "Certification Collateral"). (*Id.* ¶ 27.) However, the provision creating the security interest specifically provided that Allegan Real Estate "*shall have no security or other interest in any accounts receivable of Lessee with respect to the Project*." (*Id.* (italics added).) In accordance with the Lease, the Security Agreement between Allegan Real Estate and Capital Funding Group covered

Allegan Real Estate's interests in the Certification Collateral. Capital Funding Group filed a UCC financing statement against Allegan Nursing Home, covering the Certification Collateral. The financing statement specifically provided that the collateral "*does NOT include the accounts receivables of Debtor*." (Pl.'s Br. Supp. Ex. 5 (italics added).) Finally, as part of this component of the transaction, Allegan Real Estate entered into a Subordination Agreement with Heller Healthcare Finance, Inc. ("Heller"). (United States' Mem. Opp'n Mot. Enforce Ex. 2.) At the time the Lease was signed, Allegan Nursing Home had a preexisting loan with Heller, and Heller held a first priority security interest in Allegan Nursing Home's accounts receivable and the Certification Collateral. In order to allow Allegan Real Estate to acquire a first priority security interest in the Certification Collateral pursuant to the Lease and, by extension, to permit Capital Funding Group to acquire a first priority security interest in the Certification Collateral through Allegan Real Estate, Heller agreed to subordinate its lien in the Certification Collateral, but not Allegan Nursing Home's accounts receivable. (*Id.* at 1-2.)

In addition to the financing documents mentioned above, Allegan Real Estate and Allegan Nursing Home were each required to execute a separate Regulatory Agreement with HUD. (Pl.''s Br. Supp. Mot. Enforce Exs. 6, 7.) Allegan Real Estate's Regulatory Agreement contains certain limitations on the transfer or encumbrance of assets by Allegan Real Estate. Allegan Nursing Home's Regulatory Agreement lacks similar restrictions, although it does incorporate the Lease between Allegan Real Estate and Allegan Nursing Home. Prior to the refinancing, Allegan Nursing Home's counsel, Andrew Hakken, requested a waiver from HUD of the requirement that Allegan Nursing Home grant a security interest in its receivables to any party involved in the refinancing. On March 29, 2000, Patricia Russie, the Operation Officer in HUD's Detroit office, issued a letter on behalf of the Housing Director for the Detroit office, Robert Brown, to Mr. Hakken, copied to

Capital Funding Group, stating that such a request would not have an adverse effect upon the security of the mortgage. (Pl.'s Br. Supp. Mot. Enforce Exs. 8 and 9.)

### C. November 2006 Note and Security Agreement

From time-to-time, Piersma made operating loans to Allegan Nursing Home. On November 20, 2006, Piersma loaned Allegan Nursing Home $850,000, which was evidenced by a promissory note (the "Note") in favor of the Trust. In addition to the Note, the Trust and Allegan Nursing Home entered into a security agreement to secure the indebtedness covered by the Note. The security agreement granted the Trust a security interest in "all accounts, contract rights, chattel paper, instruments, general intangibles, and letter of credit rights, wherever located, whether now owned or hereafter acquired by Debtor." (Pl.'s Br. Supp. Mot. Enforce Ex. 10.) The Trust perfected its security interest by filing a financing statement covering the accounts receivable of Allegan Nursing Home. (Pl.'s Br. Supp. Mot. Enforce Ex. 11.)

### D. September 2008 Sale of Allegan Nursing Home

In August of 2008, Piersma and others entered into negotiations to sell Allegan Nursing Home. On September 25, 2008, Piersma and others sold 100% of their membership interests in Allegan Nursing Home to Rhema Holdings One, Inc. Following the sale, Allegan Nursing Home remained indebted to Piersma under the Note.

### E. January 2009 Sale by Allegan Real Estate

In or about January 2009, Allegan Real Estate entered into negotiations with Ely Street Holdings, a wholly-owned subsidiary of Capital Funding Group, for the sale of Allegan Real Estate's real and personal property. The sale occurred on January 9, 2009. The deed conveying the Property to Ely Street Holdings was made subject to Capital Funding Group's mortgage and the Regulatory Agreements. HUD was aware of this transaction and gave its approval. (Pl.'s Br. Supp.

Mot. Enforce Ex. 12.) On February 1, 2009, Allegan Nursing Home entered into a new lease with Ely Street Holdings. As with the 2000 Lease between Allegan Real Estate and Allegan Nursing Home, the new lease created a security interest in the Certification Collateral, *but it did not create a security interest in Allegan Nursing Homes's receivables*.

### F. State Court Litigation and Removal

After Piersma and others sold Allegan Nursing Home to Rhema Holdings, the new owners failed to pay Piersma under the Note. Plaintiffs, MIKO Enterprises, Inc., Piersma, and Allegan Real Estate, filed a three-count complaint in the Allegan County Circuit Court against Allegan Nursing Home. Plaintiffs sought to recover $765,119.17 that remains due under the Note. On October 13, 2009, the state court granted Piersma's motion for summary disposition on his claim under the Note and entered judgment in favor of Piersma in the amount of $934,836.09, which included $765,119.17 plus accrued interest in the amount of $169,716.92.

In September 2009, Capital Funding Group, Inc. and 1200 Ely Street Holdings Co. LLC moved to intervene in the state court action. The state court granted the motion and allowed them to file their complaint in intervention. On October 14, 2009, the United States filed a motion to intervene in the state court action. On October 26, 2009, the state court granted the United States' motion to intervene and allowed it to file its separate complaint in intervention. In their complaints in intervention, Capital Funding Group and Ely Street Holdings, and the United States, sought a declaratory judgment that they have a first priority security interest in the accounts in which Piersma claims a security interest. The United States removed the case to this Court on October 27, 2009, pursuant to 28 U.S.C. § 1444, on the basis that the state court action seeks to affect property encumbered by a lien interest of the United States under 28 U.S.C. § 2410.

Piersma has now moved to enforce his security interest in Allegan Nursing Home's accounts. In addition, Capital Funding Group and Ely Street Holdings have moved to stay enforcement of the judgment.

## II. ANALYSIS

### A. Trustee's Motion to Enforce Security Interest

Piersma argues that he is a judgment creditor and is entitled to enforce his security interest against Allegan Nursing Home's receivables. Piersma argues that he has shown that he holds a first priority, perfected security interest in Allegan Nursing Home's accounts receivable and that the Intervenors (collectively Capital Funding Group and the United States) cannot show that they have a security interest in Allegan Nursing Home's accounts that has priority over Piersma's security interest.

Federal Rule of Civil Procedure 69(a)(1) provides:

> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution–and in proceedings supplementary to and in aid of judgment or execution–must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a)(1). In this case, Michigan's supplementary proceedings act, M.C.L. § 600.6101, § *et seq*., applies. Pursuant to M.C.L. § 600.6104, a court may take various actions to allow a party to enforce a judgment, including compelling discovery of property or other things belonging to a judgment debtor; preventing the transfer of any property or money; and appointing a receiver. M.C.L. § 600.6104(1), (2), and (3). The act also provides a procedure for resolving disputes concerning interests in property claimed by a debtor or a third party. *See* M.C.L. § 600.6128.

Piersma contends that he is entitled to the relief he requests – enforcement of the judgment and his security interest in the accounts receivable of Allegan Nursing Home through a writ of

execution and an order directing payment of the accounts (for purposes of payments due from Medicare and Medicaid) – because he is not only a judgment creditor of Allegan Nursing Home, but is a secured judgment creditor with first priority in the receivables of Allegan Nursing Home.

The Court concludes that Piersma has a valid security interest in Allegan Nursing Home's receivables. First, the November 20, 2006, Security Agreement grants the Trust a security interest in all the receivables of Allegan Nursing Home. That security interest secures repayment of the indebtedness evidenced by the Note, upon which the state court granted partial summary disposition. In addition, the Trust perfected its security interest in the accounts receivable by filing a UCC financing statement. The Trust therefore has met all necessary requirements to establish a first priority security interest in Allegan Nursing Home's accounts unless there is another, prior security interest. *See* M.C.L.§ 440.9201(1) (stating that "[e]xcept as otherwise provided in this act, a security agreement is effective according to its terms between the parties"); M.C.L. § 440.9310 (1) (filing of a financing statement required to perfect all security interests).

Intervenors Capital Funding Group and the United States (on behalf of HUD) contend that they have a prior security interest in Allegan Nursing Home's receivables that is superior to Piersma's lien because the documents from the 2000 refinancing transaction granted Capital Funding Group a security interest in all of the receivables generated by the nursing home business conducted on the Property. This argument fails for two obvious reasons: (1) the accounts receivable at issue belong to Allegan Nursing Home, not Allegan Real Estate; and (2) Allegan Nursing Home was not a party to any of the documents upon which Intervenors rely as granting them a security interest in Allegan Nursing Home's accounts receivable. In other words, Intervenors fail to cite any document in which Allegan Nursing Home purports to grant Capital Funding Group a security interest in its receivables. The issue for Intervenors, then, is not one of priority of their lien, but

whether they have a lien in Allegan Nursing Home's receivables at all. The documents before the Court show that they do not.

The documents from the 2000 refinancing transaction show that the receivables of Allegan Nursing Home were *not* part of the collateral to secure the loan to Allegan Real Estate and do not establish a prior security interest. As set forth above, the loan was made to Allegan Real Estate, and Allegan Real Estate executed a Mortgage Note, a Mortgage, and a Security Agreement, all in favor of Capital Funding Group. In connection with the 2000 refinancing transaction, Allegan Real Estate and Allegan Nursing Home entered into a Lease whereby Allegan Real Estate leased to Allegan Nursing Home the real and personal property owned by Allegan Real Estate in order to permit Allegan Nursing Home to operate a nursing home. The Lease was approved by HUD as part of the transaction. In order to ensure that HUD and Capital Funding Group would have control over the assets necessary to operate the nursing home – the Certification Collateral – the Lease created a first priority security interest in favor of Allegan Real Estate (thereby giving Allegan Real Estate rights in the collateral for purposes of Capital Funding Group's security interest) in Allegan Nursing Home's license, Provider Agreements, and Certificates of Need. Notably, the Lease expressly stated that Allegan Real Estate had "no security or other interest in any accounts receivable of [Allegan Nursing Home] with respect to the Project." Consistent with the exclusion of receivables from the security interest granted to Allegan Real Estate, the financing statement filed by Capital Funding Group with respect to the assets of Allegan Nursing Home covered the Certification Collateral but expressly confirmed that "[s]uch collateral does NOT include the accounts receivables of Debtor." Finally, the Subordination Agreement between Allegan Real Estate and Heller further demonstrates that Intervenors hold a first priority security interest only in the Certification Collateral and not the receivables of Allegan Nursing Home. As the United States acknowledges in its brief, Capital

Funding Group acquired a first priority lien in the Certification Collateral only because Heller subordinated its interest in those assets to Allegan Real Estate. Because none of the financing documents contemplate that Capital Funding Group would receive a lien in Allegan Nursing Home's receivables, there was no need for Heller to subordinate its interest in those assets to Allegan Real Estate or any other party.

Given the absence of any document purporting to grant Capital Funding Group a security interest in the receivables of Allegan Nursing Home, Intervenors' argument essentially boils down to this: although Allegan Real Estate and Allegan Nursing Home are separate legal entities, the Court should ignore this distinction simply because the two entities shared common ownership or control. Intervenors cite no law or evidence to support their argument which, in any event, is contrary to the well-established rule that legally distinct entities must be respected in the absence of facts that warrant disregarding the corporate veil. *See United States v. Best Foods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (quoting Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929)). The evidence before the Court shows that at all times, dating back to the 2000 refinancing, Capital Funding Group and HUD treated Allegan Real Estate and Allegan Nursing Home as separate entities. Moreover, neither Capital Funding Group nor the United States cites any basis to believe that the two entities are anything other than distinct entities.

The United States devotes a substantial portion of its argument to explaining why the March 29, 2000, letter from Patricia Russie to Allegan Nursing Home's counsel was not a waiver of the Intervenors' lien position. The issue of waiver is irrelevant because, even if the Court were to

conclude that the March 29, 2000, letter did not constitute a waiver, Intervenors still could not establish a valid security interest in Allegan Nursing Home's receivables. The absence of any document purporting to create such a lien, in conjunction with documents showing that no lien was ever intended, *e.g.*, the Lease, the financing statement, and the Subordination Agreement, are more than sufficient to show that HUD waived any lien in Allegan Nursing Home's receivables.

The United States' argument that allowing Piersma to execute on the judgment against Allegan Nursing Home's receivables would violate federal law and the Regulatory Agreement that Allegan Real Estate signed fails for the reasons cited above. That is, Allegan Nursing Home is a separate legal entity and had no obligation under Allegan Real Estate's Regulatory Agreement to refrain from granting a security interest in its own receivables.

In short, the Intervenors seek to enforce a lien they do not have. The documents show without question that the parties to the 2000 refinancing transaction *intended* that Capital Funding Group would not have a security interest in Allegan Nursing Home's accounts receivables. Thus, Piersma's security interest is superior to any interest Intervenors may have.[3]

**B.    Motion to Stay Enforcement**

Capital Funding Group and Ely Street Holdings move for a stay of execution of the judgment, arguing that they and HUD have a first priority security interest in the collateral at issue. They further argue that if the Court permits Piersma to enforce the judgment against Allegan

---

[3]Capital Funding Group and Ely Street Holdings cite thirteen reasons why the motion should be denied, but many of these reasons rely upon the same faulty premise that the documents signed by Allegan Real Estate or Piersma somehow grant a security interest in Allegan Nursing Home's receivables. Capital Funding Group and Ely Street Holdings also argue that the motion should be denied because: (1) ownership or right to possession in Allegan Nursing Home's property is substantially disputed; (2) Piersma should bring his motion as a motion for summary judgment; and (3) the Court should address the Intervenors' complaints in intervention and Counts I or III of the underlying complaint before ruling on the motion. The United States makes a similar argument, stating "At a minimum, the plaintiffs' action for claim and delivery [of Allegan Nursing Home's accounts] ought to be denied at this time, and the defendants should be given an opportunity to explore the precise interrelationships among the parties through discovery." However, as noted above, there is no evidentiary support for these arguments.

11

Nursing Home's receivables, "execution will have the effect of shutting down the operations of the facility, forcing the evacuation of its residents, jeopardizing the application of Medicare and Medicaid payments for patient care, and causing the owner to violate Federal Regulations." (Capital Funding Group Mot. at 2, ¶ 3.)

This motion is denied for the reasons that Piersma's motion should be granted. Capital Funding Group and Ely Street Holdings again rely on the documents signed by Allegan Real Estate, and there is no basis to conclude that Capital Funding Group or HUD has a security interest in Allegan Nursing Home's accounts. Moreover, Capital Funding Group's and Ely Street Holdings' statements that execution will have the effect of shutting down the nursing home are unsupported by any evidence. Where are the banks? Piersma is not a bank, nor should he be expected to indefinitely underwrite the nursing home's operations. And, even if execution does disrupt the nursing home's operations, there is no legal basis to preclude Piersma from executing on his security interest. That being said, Piersma states in his reply brief that he will work with the Michigan Attorney General's office to minimize the impact on the residents of the nursing home. Considering the impact a sudden closure might have upon the residents of the home, the Court hopes that he does so, if actually necessary.

### III. Conclusion

For the foregoing reasons, the Court will grant Piersma's motion to enforce his security interest and deny Capital Funding Group's and Ely Street Holdings' motion to stay enforcement.

An Order consistent with this Opinion will be entered.

Dated: January 12, 2010                             /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE